Argued and submitted July 1, reversed and remanded with instructions
October 27, 1999

## ROBERTO BLANCO AQUINO,
*Appellant,*

*v.*

## G. H. BALDWIN,
Superintendent,
Eastern Oregon Correctional Institution,
*Respondent.*

## (CV95-0639; CA A100284)

991 P2d 41

Harrison Latto argued the cause and filed the brief for appellant.

Christina M. Hutchins, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before De Muniz, Presiding Judge, and Haselton and Wollheim, Judges.

DE MUNIZ, P. J.

## DE MUNIZ, P. J.

Petitioner petitioned for post-conviction relief from his convictions on multiple counts of first-degree rape, ORS 163.375, first-degree sodomy, ORS 163.405, and first-degree kidnapping, ORS 163.235, asserting that he was deprived of effective assistance of counsel, in violation of Article I, section 11, of the Oregon Constitution, and the Sixth Amendment to the United States Constitution. The trial court denied petitioner's claims. On appeal, we reverse.

In June 1993, defendant was indicted on multiple counts of first-degree rape, first-degree sodomy and first-degree kidnapping, based on events that occurred on May 16, 1993. Jesus Morales was tried at the same time. At trial, one of the victims, Sylvia Garcia, testified to the following series of events. On the evening of May 15, 1993, she and her sister Melissa went to a dance in Caldwell, Idaho. After the dance ended in the early morning hours of May 16, Sylvia saw a man she knew as Jose in a convenience store. She said she had seen Jose earlier at the dance. At trial, she identified defendant as "Jose." Sylvia asked Jose if he would give her a ride home, and he agreed, stating that he had to drop off two other people in Oregon first.

Sylvia and Melissa Garcia got into a car with Jose and three other men. Jose told Sylvia that it was his car. Sylvia identified codefendant Jesus Morales, who had a pierced nose and ear, as one of the men in the group. The group drove to Oregon where they stopped at another convenience store and purchased beer. The men would not let the women out of the car during that stop. The group then drove out into the country. All of the men were drinking beer and smoking cigarettes. They offered Sylvia drugs, but she declined. Sylvia had a few drinks of beer, but Melissa did not. Sylvia also had consumed two 12-ounce beers at the dance. The driver stopped the car on a side road, and Morales grabbed Melissa. Sylvia tried to stop him, but Jose and another man grabbed her. Those two men removed Sylvia's shorts and raped her, then one of the men who had attacked Melissa raped her. Sylvia saw the man with the pierced ears and nose on top of Melissa and kicked him, and they fought while Melissa ran away. The men got into the car and left.

The women, left without shorts or underwear, eventually flagged down a passing truck and were brought to the police station and then to the hospital.

Melissa's testimony was similar. She identified Morales as the man with pierced nose and ears who had raped her. She testified that another of the men had anally raped her. She was unable to identify any of the other three men involved in the abduction and rapes.

Several hours after the rapes occurred, a car was discovered abandoned in a field. The car matched the description of the car given by the Garcias. The women's shorts and underwear were found in the car, as were beer cans and cigarette butts. The women identified the location where the rapes occurred. Beer cans, cigarette butts, and a footprint were found at the site.

Some time after the rapes, Sylvia Garcia saw a man she believed to be one of the rapists getting into a yellow car. The license plates on that car eventually were traced to petitioner, who ultimately was charged with the crimes. At trial, the state put on evidence that a footprint found at the scene of the rape was made by a shoe with a sole similar to the sole of one of defendant's shoes. The state also presented evidence that petitioner smoked Marlboro cigarettes and that Marlboro cigarette butts had been retrieved at the scene of the crime. Although a number of fingerprints and palmprints were found on the car, none of petitioner's prints were found.

Petitioner's defense was that this was a case of mistaken identity. He presented evidence that another man in the community was very similar in appearance and had been mistaken for petitioner on occasion. Petitioner also presented evidence that, at the time of the crimes, he was an inmate in a secure alcohol recovery facility. He presented evidence that the doors of the facility were locked and alarmed, except for the front door, which was within the view of the night staff attendant. He presented evidence that all of the windows had screens that could not be removed from the inside without damaging them and that none of the screens had been damaged on the night of the rapes. He testified that he had not left the facility. He presented testimony from several staff from the alcohol recovery facility and another resident who

did not believe that petitioner could have escaped from the facility and return undetected. He also presented evidence that Sylvia Garcia's blood alcohol level some four hours after the rape had occurred was .05.

During the course of the trial, a man going by the name of Aurelio Bernardo Cruz, an individual of similar appearance to petitioner, was arrested on unrelated charges, and Sylvia Garcia tentatively identified a photograph of Cruz as petitioner. Shoes belonging to Cruz were compared to the footprint found at the scene of the rape and found to be similar. All of this information was presented to the jury before the conclusion of the trial. The prosecutor had had information before trial indicating that Cruz was one of the rapists but had believed that Cruz was one of petitioner's aliases and was not a real person.

After the defense had rested its case, the court asked the prosecutor if there was any rebuttal. The prosecutor replied that she would soon have results from the crime lab, which was working on comparing Cruz's prints with those found at the scene of the rape. The prosecutor stated: "If there—if his prints are not on the car we're just at the same place we are in now. If they are in the car it would probably [be] useful to [defense counsel]. That would be the only additional testimony that we'd have." Shortly thereafter, the court explained to the jury that there was a possibility that there would be more evidence presented the following day.

The following day, no mention was made of any additional evidence. The parties presented their closing arguments, and the jury retired to deliberate. While the jury was deliberating, the parties received information from the crime lab that Cruz's prints had been found on the car associated with the rape. The jury thereafter returned a verdict of guilty as to both petitioner and Morales.

Defense counsel moved for a new trial on the ground of newly discovered evidence. The prosecutor opposed the motion on the ground that the Cruz print evidence was not newly discovered because defense counsel knew during trial that the evidence might be forthcoming but failed to move for a continuance to await its arrival. The prosecutor further asserted that she believed that Cruz was one of the rapists

but that she thought that both petitioner *and* Cruz had been among the four rapists. The trial court denied the motion. At sentencing, codefendant Morales testified that, on the night of the rape, he was with Aurelio Bernardo Cruz, Jesus Bernardo Cruz, and Felipe Pablo Conesco and that they had attended the dance in Caldwell and picked up the rape victims, but that Morales had left the group before the rapes occurred. He further testified that petitioner had not been with them that evening.

Petitioner petitioned for post-conviction relief, alleging, among other things, that he had had ineffective assistance of trial counsel. In particular, petitioner argued that trial counsel's failure to call as a witness the employee who was on duty at the alcohol recovery facility on the night of the rapes constituted inadequate assistance of counsel, as did counsel's failure to move for a continuance to await the results of the Cruz fingerprint comparison.

Trial counsel testified at the post-conviction hearing that, at the time of the trial, he had only a few months' experience as a criminal defense attorney and that he believed that, if he had handled the case differently, petitioner would not be in prison. Trial counsel further testified that he had not called the attendant on duty at the alcohol recovery facility because the state had stipulated that the records showing that nobody had left the facility would be admissible and that he believed that the attendant on duty was a recovering alcoholic and "was afraid they were going to try and discredit him." Trial counsel did not articulate any reason why he did not move for a continuance to await the fingerprint information on Cruz.

Further evidence at the post-conviction hearing consisted of testimony from the attendant who was on duty at the alcohol recovery facility, who testified that nobody would have been able to sneak out and back in while he was on duty. Further testimony by Dr. Grimsbo, a forensic expert, indicated that, given the amount of blood alcohol in Sylvia Garcia's blood several hours after the rape, she had most likely consumed six or seven beers rather than two beers. He further testified that it would have been possible to perform

DNA tests for saliva on cigarette butts found at the scene of the crime to verify the identity of the rapists.

The post-conviction court made numerous findings, including a finding that petitioner's claim that trial counsel was inadequate for failing to move for a continuance to await additional fingerprint evidence was "factually incorrect." The post-conviction court concluded that petitioner received constitutionally adequate assistance of counsel.

■ On appeal, we address only the argument that the post-conviction court erred in holding that petitioner received constitutionally adequate assistance of counsel. To prevail on an inadequate assistance of counsel claim under Article I, section 11, of the Oregon Constitution, a petitioner has the burden to demonstrate that counsel failed to exercise reasonable professional skill and judgment and that the petitioner suffered prejudice as a result of counsel's failure to do so. *Stevens v. State of Oregon*, 322 Or 101, 108, 902 P2d 1137 (1995). *See Krummacher v. Gierloff*, 290 Or 867, 875, 627 P2d 458 (1981) ("only those acts or omissions by counsel which have a tendency to affect the result of the prosecution can be regarded as of constitutional magnitude"). A similar standard applies to claims based on the Sixth Amendment to the United States Constitution. *Chew v. State of Oregon*, 121 Or App 474, 477, 855 P2d 1120, *rev den* 318 Or 24 (1993).

■ We first turn to petitioner's argument that trial counsel provided constitutionally inadequate assistance of counsel because he did not call as a witness the attendant on duty at the alcohol recovery facility on the night of the rape. Petitioner argues that the alibi evidence was crucial and that this testimony would have been stronger than the evidence from the log book and from the two counselors who were not on duty that night. The state argues that the evidence was cumulative and that trial counsel made a reasonable tactical decision not to call this employee as a witness. We disagree that this type of alibi evidence can be described as unnecessarily cumulative; due to the nature of an alibi defense, generally, the more people that can testify that a person was elsewhere at the time of the crime, the stronger the defense.

Although the attendant's evidence was similar to that presented by petitioner himself, by another resident at the facility and by two counselors who were not on duty that night, we do not view the evidence as cumulative because this attendant was the person who was in the best position to know whether petitioner had actually left the facility on the night of the rapes.

■ However, as to the state's argument that trial counsel's decision not to call this witness was a permissible tactical choice, we must agree. In hindsight, it undoubtedly appears that trial counsel erred in failing to call this witness. However, "[t]he constitution gives no defendant the right to a perfect defense—seldom does a lawyer walk away from a trial without thinking of something that might have been done differently or that he would have preferred to have avoided. Adequacy of assistance of counsel * * * allows for tactical choices that backfire, because, by their nature, trials often involve risk." *Krummacher*, 290 Or at 875. The present case differs, for example, from *Stevens*, in which the court found that trial counsel's failure to present a defense that the petitioner could not have committed a rape due to impotence and failure to investigate witnesses whose testimony could have revealed the victim's bias were not permissible tactical choices. 322 Or at 109-10. Here, by comparison, the question concerns *how*, not *whether*, trial counsel presented an alibi defense. The evidence that trial counsel did present concerning petitioner's alibi was not weak evidence, despite the fact that the jury chose to disbelieve it. We conclude that it was a permissible tactical choice for trial counsel to present petitioner's alibi defense through evidence and testimony other than that of the attendant who was on duty at the treatment facility on the night of the rapes.

■■ The state also argues that trial counsel's failure to seek a continuance to await the Cruz print evidence was a reasonable tactical choice. For the following reasons, we disagree. As a preliminary matter, though, we must address the post-conviction court's factual finding that petitioner's argument that trial counsel was inadequate for failing to move for a continuance to await additional fingerprint evidence was "factually incorrect." We are bound by the trial court's factual findings if supported by the evidence in the record. *Ball v.*

*Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). We are, however, at a loss to understand what the post-conviction court meant when it described petitioner's arguments as "factually incorrect." Reviewing the post-conviction court record, it appears that post-conviction defense counsel for the state misread the trial court record, given his assertion in the state's trial memorandum:

> "Petitioner's claim that trial counsel should have moved for a recess to await fingerprint analysis to come back from Bend on a newly arrested suspect is factually incorrect. The analysis had already come back."

That is the only thing in the record that could possibly be viewed as supporting the trial court's finding about "factual incorrectness." However, assertions in a trial memorandum that misstate what is in the record are, as a matter of law, not evidence in the record that may support a trial court's factual findings.[1] To the extent that the post-conviction court's factual finding may be based on the state's argument that the fingerprint analysis results came back before the case was submitted to the jury, it is entirely unsupported by the trial court record, and we are not bound by it under *Ball v. Gladden*.

■       The question, then, is whether trial counsel provided constitutionally inadequate assistance of counsel when he failed to seek a continuance in order to await the print information that he knew would arrive shortly. On appeal, the state characterizes counsel's failure to seek a continuance as a "tactical decision." However, nothing in the record of the underlying trial or in trial counsel's testimony in the post-conviction proceeding suggests that counsel made a tactical decision concerning this evidence. The record is entirely silent as to why counsel failed to seek a continuance to await this evidence, particularly in light of the fact that both the prosecutor and the trial court appear to have been willing to await this evidence.

---

[1] During the motion for a new trial in the underlying criminal case, the prosecutor told the trial court: *"After the jury went out,* Detective Painter called me and indicated that he had found the prints in the car." (Emphasis added.)

The state argues, nonetheless, that trial counsel may have deliberately chosen not to await this evidence because "if Sylvia Garcia's identification of another rapist had been confirmed by physical evidence, such as the palm print evidence, her ability to identify her rapists would have been bolstered." The state's argument might make sense if there were an unlimited number of rapists involved. However, the victims described four rapists who had dissimilar physical characteristics. The physical description of *one* of the rapists matched *both* petitioner and Aurelio Bernardo Cruz, and, in fact, Sylvia Garcia tentatively identified Cruz as petitioner at one point. The key fact to be established by the print evidence was not that Sylvia Garcia had successfully identified an *additional* rapist but that she had *mis*identified petitioner as Cruz, whose appearance and shoes were similar to those of petitioner, and whose prints were found on the car used in the rape. That was the theory of the case that defense counsel argued to the jury in closing argument. Awaiting the fingerprint results certainly could have bolstered that defense. No tactical advantage could have been gained by foregoing the opportunity to present that evidence. We conclude that petitioner's trial counsel did not make a permissible tactical choice in failing to move for a continuance to await the print evidence that he knew would arrive shortly.

■■ The question remains whether petitioner was prejudiced by his trial counsel's failure to provide adequate assistance of counsel. The state asserts that petitioner failed to establish that counsel's failure to move for a continuance to await the print evidence prejudiced him. To establish prejudice in a post-conviction case, a petitioner must demonstrate that trial counsel's omission had " 'a tendency to affect the result' " of the case. *Stevens*, 322 Or at 110 n 5, *quoting Krummacher*, 290 Or at 883. We conclude that petitioner's evidence does establish that trial counsel's omission had a tendency to affect the outcome of the case. As noted above, petitioner's defense was that he had an alibi and that someone whose appearance was similar to his committed the rapes. The evidence that trial counsel failed to present was strong evidence that someone whose appearance was similar to petitioner's appearance had left prints at the scene of the

crime. We believe that such evidence certainly could have a " 'tendency to affect the result.' " *Id.* We conclude that petitioner is entitled to post-conviction relief.

Reversed and remanded with instructions to enter post-conviction relief.